IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| MAROL K. LEE aka MAROL K. LOFTIS, | ) ) ) | Civ. No. 12-00604 BMK |
| Plaintiff, | ) ) | ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND |
| vs. | ) ) | DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT |
| HAWAII PACIFIC UNIVERSITY, ET AL., | ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

ORDER GRANTING DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT AND DENYING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT

Before the Court are Defendants Hawaii Pacific University ("HPU"),

Deborah Nakashima, and John Kearns' ("Defendants"), and Plaintiff Marol K.

Lee's ("Lee") cross Motions for Summary Judgment.  (Docs. 68, 71.)  The Court

heard these Motions on February 11, 2014.  After careful consideration of the

Motions and the supporting memoranda, Defendants' Motion for Summary

Judgment is GRANTED, and Plaintiff's Motion for Summary Judgment is

DENIED.

## FACTUAL BACKGROUND

At the time of the events leading to this lawsuit, Lee was employed as the Director of HPU's Navy College Program Distance Learning Partnership and Off-Island Advising ("NCPDLP/OIA").  (Gallogly Decl ¶ 7.)[1]  In this capacity, Lee was responsible for all Navy Distance Learning students participating in the program online and away from campus.  (<u>Id.</u>)

In addition to her role as Director of NCPDLP/OIA, Lee also served as an on-call adjunct professor teaching on-base courses for the Military Campus Program ("MCP").  (Lee 10/17/13 Depo pp. 70-73.)  As an adjunct professor, Lee worked under short-term contracts that continued for the duration of the particular course being taught.  (<u>Id.</u> pp. 83-86.)

While employed by HPU, Lee was also enrolled as a graduate student in the MCP.  (Lee 10/24/13 Depo p. 208.)  As a student, Lee applied for and received federal loans for graduate students.  (<u>Id.</u> at 215-16.)  Lee used at least some of these loan funds to pay for enrollment in undergraduate courses.  (<u>Id.</u> at 216.)

---

[1] Ralph Gallogly served as Lee's immediate supervisor while she was Director of NCPDLP/OIA.  (Gallogly Decl ¶ 8.)

During Lee's tenure at HPU, Stacie Espina ("Espina") worked as HPU's Senior Financial Aid Advisor.  (Id. at 155.)  In this capacity, Espina assisted NCPDLP/OIA and MCP students with financial aid and regularly coordinated with Lee.  (Id. at 156, 158)  Espina also assisted Lee in completing her own student financial aid forms.  (Id. at 214.)  Espina, like Lee, was also enrolled as a student at HPU.  (Gallogly Decl ¶ 10.)  As a student, Espina took several classes taught by Lee, including, on two occasions, taking the same class multiple times while receiving an "A" grade in the class each time.  (Id.)

On January 13, 2012, Lee appeared before an HPU investigatory panel convened to inquire into the possibility that Espina was guilty of "overawarding" her own financial aid.  (Nakashima Depo at 55:12-13, ex. F.)  This panel was composed of Assistant Vice President of Human Resources Dailyn Yanagida-Ishii ("Ishii"), Director of Internal Audit Kelli Green ("Green"), and Executive Director of Student Academic Services Deborah Nakashima ("Nakashima").  (Nakashima Depo, ex. F.)   HPU's Motion for Summary Judgment asserts that during the Espina investigation, suspicion arose that Lee had also engaged in misconduct as both an employee and student.  (HPU MSJ at 9.)  Accordingly, HPU initiated internal investigations of Lee in her capacity as both an employee and as a student.

3

On January 19, 2012, Ishii delivered a letter to Lee informing her that, "[e]vidence from an independent investigation suggests that you engaged in conduct violating University policies when you inappropriately used your position as Director of NCPDLP and Off Island Advising to obtain benefits for which you may not have been eligible." (Nakashima Depo, ex. A.)  Specifically, the letter stated that Lee was suspected of violating HPU's Employee Handbook by falsifying records and abuse of position.  (Id.)  The letter informed Lee that an "objective and impartial investigation will be conducted" by Ishii and Green into possible employment misconduct, and that Nakashima would also be present in connection with an investigation into possible student misconduct.  (Id.)  Finally, the letter instructed Lee that, effective immediately, she was being placed on unpaid administrative leave from her position as Director.  (Id.)

On January 27, 2012, Nakashima sent Lee a letter informing her that she was suspected of violating HPU's Code of Student Conduct.  (Nakashima Depo, ex. B.)  Specifically, Lee was suspected of providing false information on her financial aid forms, unauthorized alteration or use of class registration forms, and theft of financial aid.  (Nakashima Depo at 23-24, 27.)  The letter stated the matter would be adjudicated in accordance with the policies and procedures set out in the Code of Student Conduct and that until a final investigation and proceedings

are complete, Lee was being placed on "interim suspension" as a student.

(Nakashima Depo, ex. B)

On January 30, 2012, Lee appeared before the same investigatory

panel that had previously interviewed her about Espina. (Nakashima Depo, ex. G.)

In her signed statement from this January 30 interview, Lee acknowledged that she

was enrolled in a master's degree program, had received Graduate Plus loans, but

had taken primarily undergraduate courses that may not count toward a graduate

degree.  (Nakashima Depo, ex. G at 2.)  Lee stated she was unaware that Graduate

Plus loans were only for students taking courses toward a graduate degree.  (Id.)

In regard to her financial aid, Lee stated that she had stopped asking

for staff tuition waivers "because I felt financial aid was a better option."  (Id.)  Lee

stated further that she did not ask questions when she received a financial aid

refund in Term 1 of 2011 of $14,000, double what she had received for the same

term the previous year.  (Id.)

In regard to her position as an adjunct professor and employee, Lee

admitted that she had enrolled Espina in her class even though she had already

taken it, because without a threshold of 7-8 students the class would be canceled.

(Nakashima Depo, ex. G at 3.)  "My course enrollment was low and I wanted it to

'go.'"  (Id.)  Lee stated that it had been her intention to drop Espina from the class

after it began, but she forgot.  (Id.)  According to Lee, Espina had also been enrolled multiple times for the same online courses taught by Lee, but there was no record of her ever logging in to participate.  (Id.)  Lee said that she had also enrolled herself in courses for the purpose of helping other instructors meet enrollment thresholds.  (Id.)

The day after Lee's investigatory interview, Lee contacted Nakashima via email concerned that because she was on administrative leave, her children's health benefits were being terminated.  (Nakashima Depo, ex. C.)  Lee's email continued, "I haven't been afforded an opportunity to address my concerns HPU may have prior to theses events.  I feel that I should have an attorney present with me so I can understand what is going on."  (Id.)  Nakashima responded that she adjudicates student issues "which has nothing to do with your position as a staff member."  (Id.)  Nakashima advised Lee that attorneys were not permitted in Student Conduct hearings, but that she could have an adviser attend, who could be a fellow student, staff member, of member of the faculty.  (Id.)  Nakashima informed Lee she would be contacted by her assistant to schedule her student hearing.  (Id.)  In regard to her employment, Nakashima told Lee, "those concerns should be addressed with your supervisor" or Ishii, the Assistant Vice President of Human Resources.  (Id.)

According to email exchanges between Lee and Nakashima, Lee was apparently unable to schedule a time for Lee's Student Conduct hearing in a timely fashion.  (Nakashima Depo, ex. H.)   Unable to schedule an additional Student Conduct Hearing, Lee elected to use the statement she had provided at the January 30 investigatory hearing in lieu of a second interview.  (Nakashima Depo at 60-61.)

On March 5, 2012, Nakashima sent Lee a letter "as a final resolution" of the allegations of non-academic student misconduct that had been made against her.  (Lee MSJ, ex. 5.)  This letter stated that Lee had been found "responsible" for: 1) intentionally furnishing false information to the university; 2) forgery, unauthorized alteration, or unauthorized use of university documents; 3) attempted or actual theft of property or services; and 4) unstated violations of federal, state, or local law.  (Id.)  As a result, Lee was placed on "University Probation" until completion of her second master's degree, and required to meet with a graduate advisor in her current program in order to register for further courses.  (Id.)

On April 18, 2012, John Kearns, then Vice President of Academic Affairs, wrote to Lee regarding her employment at HPU.  (Lee MSJ, ex. 6.)  The letter informed Lee that she was being terminated from her position as Director of NCPDLP and OIA.  The letter continued,

7

> investigators found it more likely than not that you
> engaged in the following misconduct:  Improper student
> registration and grade inflation for a co-worker ("Co-
> Worker Y"). The investigators found that you permitted
> Co-worker Y to register for MGMT 2500 a second time,
> despite Co-worker Y having received an "A" the first
> time she took the course.  The investigators also found
> that you permitted Co-worker Y to register for MGMT
> 3000 a second time, despite Co-worker Y having
> received an "A" the first time she took the course.  The
> investogators further found that not only did you register
> Co-worker Y for the second round of MGMT 2500 and
> 3000 courses; you were the instructor for all fours
> courses . . . .  Finally, the investigators found, based in
> part on your admissions, that as Co-worker Y's instructor
> for 3 online courses, you awarded her "A" grades without
> requiring her to complete course requirements, or in all
> instances, ever log into the course.

(Id.)  This conduct was found to violate HPU's prohibition against "falsification:

falsifying, altering or misstating facts of employment applications, University

records, customer records, and reports such as leave requests, attendance records

and work records. Committing a fraudulent act."  (Id.)  Kearns's letter noted,

however, that termination from her Directors position "does not apply to your

future course assignments as an adjunct professor."  (Id.)

Days after termination from her Directors position, Lee filed a claim

for Unemployment Benefits with the State of Hawaii.  (Lee MSJ, ex. 8)  In

connection with Lee's application, HPU's Department of  Human Resources

("HR") was asked to provide information to the State regarding the "claimant's

8

eligibility for benefits." (Id.)   On the information request form, HR indicated that Lee was still on payroll as a part-time adjunct professor.  (Id.)   Lee asserts that this statement regarding continuing employment resulted in the denial of her application for unemployment benefits.  (Complaint at 4.)

In regard to actually continuing to work as an adjunct professor, Lee stated that she contacted her supervisor Ralph Gallogly to ask if she would still be able to teach.  (Lee 10/24/13 Depo at 224.)  Gallogly responded, after checking with other members of HPU's administration, that Lee would be unable to teach due to her termination.  (Id.)  Lee states that, despite being told she would be unable to teach, she continued to be listed on HPU's website as an adjunct professor, and received no response when she emailed for further clarification as to whether she would be able to teach.  (Id.)

Six months after her termination as Director of NCPDLP/OIA Lee filed a two count Complaint against Defendants in state court asserting: Count I, violation of state laws; and Count II, violation federal laws.  (Complaint at 4-5.) As a matter of Hawaii law, Lee asserted:  1) violations of her state constitutional right to due process and equal protection; 2) intentional interference with her prospective economic advantage; and 3) intentional and negligent infliction of severe emotional distress.  (Id.)  As a matter of federal law, Lee alleged violation

of her constitutional rights to equal protection and due process "in that [Lee] was

terminated and suffered discrimination in terms, conditions, and privileges or her

employment."  (Id.)  Shortly after the filing of Lee's Complaint, Defendants

removed this case to federal court pursuant to 28 U.S.C. § 1331 and 28 U.S.C. §

1367(a).  (Doc. 1.)  Now before the Court are cross Motions for Summary

Judgment.

STANDARD OF REVIEW

A motion for summary judgment may not be granted unless the court

determines that there is no genuine issue of material fact, and that the undisputed

facts warrant judgment for the moving party as a matter of law.  See Fed. R. Civ. P.

56(c).  In assessing whether a genuine issue of material fact exists, courts must

resolve all ambiguities and draw all factual inferences in favor of the non-moving

party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); see also

Cline v. Indus. Maint. Eng'g & Contracting Co., 200 F.3d 1223, 1228 (9th Cir.

2000).  However, the non-moving party cannot rely upon conclusory allegations

unsupported by factual data to create an issue of material fact.  Hansen v. U.S., 7

F.3d 137, 138 (9th Cir. 1993).

In deciding a motion for summary judgment, the court's function is

not to try issues of fact, but rather, it is only to determine whether there are issues

10

to be tried.  <u>Anderson</u>, 477 U.S. at 249.  If there is any evidence in the record from which a reasonable inference could be drawn in favor of the non-moving party on a material issue of fact, summary judgment is improper.   See <u>T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n</u>, 809 F.2d 626, 631 (9th Cir. 1987).

DISCUSSION

I.             <u>Violation of Due Process and Equal Protection</u>

Lee asserts she "had a constitutionally protected property interest in continued employment and she may not be deprived of that employment without due process of law." (Lee MSJ at 9.)  According to Lee, her rights to due process were violated when she was terminated as Director of NCPDLP/OIA and not afforded an opportunity to review documents constituting her alleged falsification, not allowed to confront her accusers, and not afforded the right to legal representation.[2]  (Lee Opp. at 8.)

Defendants counter that a civil action based on the deprivation of due process rights requires a showing that the deprivation was committed by a person

---

[2]  In her deposition, Lee also asserts violations of her due process rights in connection with her student probation and in not being contacted for continued work as an adjunct professor. (Lee 10/24/13 Depo at 226-227.)  However, it appears that the only due process claims addressed in either Lee's Motion for Summary Judgment or Lee's Opposition to Defendants' Motion for Summary Judgment relate to her employment.  (See Lee MSJ at 6, Lee Opp. at 8.) Accordingly, the Court limits its analysis to Lee's assertion that she was denied employment without due process.

11

acting under color of state law.  (Def.'s Motion at 17.)  Because HPU is a private

institution, Defendants assert there is no such showing, and Lee has failed to state a

cognizable claim.  (Id. at 20.)  Lee argues that HPU's involvement with veteran's

programs and extensive government funding create a sufficient nexus between

HPU and state and federal government to make HPU a "government actor" for

purposes of due process protection.  (Lee Reply at 4-10.)  As discussed below, the

Court finds that Lee has failed to show that she has a protected property interest in

continued employment at HPU sufficient to trigger the requirements of

constitutional due process.  Accordingly the Court need not address whether HPU

is (or is not) a government actor.

   The right to procedural due process under the Fourteenth Amendment

protects individuals from being deprived of either liberty or property without

adequate notice and hearing.  Board of Regents of State Colleges v. Roth, 408 U.S.

564, 571-72 (1972).  To have a constitutionally protected property interest in a

benefit such as employment, "a person clearly must have more than an abstract

need or desire for it.  He must have more than a unilateral expectation of it.  He

must, instead, have a legitimate claim of entitlement to it."  Roth, 408 U.S. at 577.

A claim of entitlement, in turn, is not created by the Constitution, but rather is

created and defined by an independent source such as state law.  Id. at 577; see also

Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538 (1985) (holding that Ohio civil service statute stating that employees would not be dismissed except for misfeasance, malfeasance, or nonfeasance established property right in continued employment requiring due process before termination).

In the case of government employed university or college instructors, absent a statute speaking to employment, as in Loudermiller, a protected property interest in continued employment may be created if the instructor has a legitimate claim to tenure or if the terms of employment make clear that the employee can only be fired for cause.  See Roth, 480 U.S. at 576-78 (holding that due process protections were not required where professor had no legitimate claim to tenure); Perry v. Sindermann, 408 U.S. 593, 599-603 (1972) (holding that internal faculty guide suggesting dismissal would only be for cause created a triable issue of fact as to whether a property interest in employment had been created);  see also Blantz v. California Dept. of Corrections, 727 F.3d 917, 922 (9th Cir. 2013) (applying the Roth - Sindermann framework to government contractor and finding no legitimate property interest in continued employment).[3]

---

[3]  For purposes of state constitutional protections, Hawaii has adopted the same framework set out in Roth and Sindermann.  See Abramson v. Board of Regents, Univ. of Hawaii, 548 P.2d 253, 262 (Haw. 1976) (holding that in the absence of any university rule or policy an instructor had no legitimate claim to continued employment in a tenured position after concluding a probationary period).

Lee has failed to demonstrate that her position of employment as Director of NCPDLP/OIA was a position to which she had a legitimate claim of entitlement. Lee does not assert that she held a tenured position at HPU and has not presented evidence of internal HPU policies that make clear employees can be fired only for cause. Indeed, citing HPU's Employee Handbook, Lee admits "there is no doubt that Ms. Lee's employment can be characterized as 'at will'" (Lee MSJ at 11), and recognizes that the Handbook states "any employee can be terminated at any time for any reason." (Lee Reply at 14.)

Lee nonetheless argues, pursuant to Kinoshita v. Canadian Pacific Airlines, Ltd., 724 P.2d 110 (Haw. 1986), that HPU effectively issued a policy constraining its authority to terminate employees at-will. (Lee Motion at 11.) Kinoshita, like Sindermann, held that where an employer issues policies or procedures creating an atmosphere of job security and fair treatment, the employer could not then disregard those rules and treat employees as terminable at will. Kinoshita, 724 P.2d at 117. Lee, however, cites no policy statement "in a manual or otherwise," id., to support the contention that HPU had adopted policies qualifying employees' at will status. Rather, Lee points to the deposition of a fellow professor for the proposition that it was a common practice to allow students to enroll in the same classes multiple times. (Lee Motion at 12.)

14

That another teacher asserted it was common practice to enroll students in classes multiple times, to effectively pad the class and ensure sufficient enrollment, is insufficient to demonstrate that HPU adopted, endorsed, or was even aware of the practice.  Moreover, the student enrollment practices of teacher/employees does not represent an HPU policy affecting job security sufficient to alter HPU's express at will employment policy.

Aside from this unavailing argument based on <u>Kinoshita</u>, Lee's Motion for Summary Judgment simply asserts that she has a protected property interest in continued employment.  Lee offers a citation to <u>Kekai v. Hargrave</u>, 649 F.2d 748 (9th Cir. 1981), with no analysis or discussion whatsoever, and follows with the conclusory statement that "Ms. Lee demonstrated she has a legitimate claim of entitlement to her employment."[4]  (Lee MSJ at 6.)   The court finds that Lee has not demonstrated any such claim of entitlement to continued employment. Absent any showing that Lee had a legitimate claim to continued employment, the Court holds that Lee was terminable at will, and that HPU was not required to provide notice of hearing prior to terminating Lee.  Lacking a property interest in her continued employment, Lee has no grounds to assert a due process violation.

---

[4] Notably <u>Kekai</u> involved an employee who was held to have no legitimate property interest in continued employment.

15

Having already acknowledged her at will status, Lee, however, attempts to revive her due process claim, arguing that she falls into an exception to the terminable at will doctrine.  She asserts that even though employed at will, her termination was an unlawful violation of public policy.  (Lee Motion at 11.)  The Court disagrees.

The Hawaii Supreme Court has held that where an employer's discharge of an employee "violates a clear mandate of public policy," the employer may be tortiously liable.  Parnar v. Americana Hotel, Inc., 652 P.2d 625, 631 (Haw. 1982).  To determine whether a "clear mandate of public policy"  has been violated, Hawaii courts inquire whether the employer's conduct "contravenes the letter or purpose of a constitutional, statutory, or regulatory provision or scheme." Id.   In Parnar, for example, the termination of an at will employee was held to be a possible retaliatory discharge in furtherance of a statutory antitrust violation.  Id. Accordingly, the statutory violation created an exception to the employer's right to terminate an employer at will, and gave rise to a possible tort claim for retaliation.

Lee's only claim of constitutional, statutory, or regulatory violation is her due process claim.  As discussed above, the Court finds that Lee has no cognizable due process claim because she was terminable at will and had no claim of entitlement to continued employment.  Lee cannot argue that she falls into a

public policy exception to the terminable at will doctrine based on a non-existent constitutional due process right.  This is an untenable circular argument.  Lee had no right to due process because she was terminable at will.  She cannot assert that she was not terminable at will because of her due process rights.

Lee does not allege any other specific constitutional, statutory, or regulatory violations in connection with her termination.  Other than due process, Lee presents no specific public policy violation, but rather simply asserts that such an exception to at will employment generally exists.  The Court finds that in the context of her due process claim, Lee's vague assertion of a tortious public policy violation is a red herring without foundation.

The Court holds that Lee has failed to provide evidence of a due process claim because she has not shown a sufficient property interest in her continued employment with HPU.  Moreover,  even if there was some basis in law for requiring that Lee receive due process - notice and a hearing prior to her termination - the Court notes that Lee received both.  Lee received a letter informing her that she was under investigation for possible employee misconduct, which spelled out the general charge against her.  After receiving notice, Lee appeared before an investigatory panel and made a statement that she was permitted to review and approve.  Lee provides no authority for her assertion that

17

she had a right to confront her accusers and consult with counsel in connection with this investigatory hearing.

II.          Intentional Interference With Prospective Business Advantage

Lee asserts that HPU committed the tort of Intentional Interference with Prospective Business Advantage when HPU led her to believe that she could continue working as an adjunct professor, but never called back to schedule her for any classes.  Lee asserts that as an adjunct she could have taught up to seven classes a year earning $2,350 per class for a total of $16,450 per year.  Lee states that "because no one called her to work" she took a part-time job earning only $8,650 for the year.  Therefore Lee claims HPU's actions resulted in damages equal to the difference between what she could have earned teaching seven classes and what she actually earned at her part-time job.  (Lee Opp. at 9.)  Additionally, Lee asserts that but for HPU listing her as on payroll as an adjunct professor, she could have received $560 per week in unemployment benefits.  Accordingly Lee asserts HPU intentionally caused her to loose a year of unemployment benefits, or an additional $29,120.

Intentional or tortious interference with prospective business advantage  ("IPBA") requires:

> (1) the existence of a valid business relationship or a
> prospective advantage or expectancy sufficiently definite,

18

specific, and capable of acceptance in the sense that there is a reasonable probability of it maturing into a future economic benefit to the plaintiff;

(2) knowledge of the relationship, advantage, or expectancy by the defendant;

(3) a purposeful intent to interfere with the relationship, advantage, or expectancy;

(4) legal causation between the act of interference and the impairment of the relationship, advantage, or expectancy; and

(5) actual damages.

Robert's Hawaii Sch. Bus, Inc. v. Laupahoehoe Transp. Co., Inc., 982 P.2d 853, 887 (Haw. 1999) (citing Locricchio v. Legal Services Corp., 833 F.2d 1352, 1357 (9th Cir. 1987)).  As explained in Locricchio, the "valid business relationship" or "prospective advantage or expectancy" protected by the tort IPBA is between the plaintiff and a third-party.  Locricchio 833 F.2d at 1357 ("there must be a 'colorable economic relationship' between the plaintiff and a third party with 'the potential to develop into a full contractual relationship."); see also Hawaii Medical Ass'n v. Hawaii Medical Service Ass'n, 148 P.3d 1179, 1217 (Haw. 2006). (quoting Locricchio, 833 F.2d at 1357).

Accordingly, a claim of IPBA may be made against a defendant that is accused of interfering with the relationship between the plaintiff and a third-party.

19

This is in keeping with the primary object of the tort of IPBA, to ensure free competition among business competitors, but to limit competitors from unduly interfering with each other once contractual or firm business relationships have materialized with third parties.  See Robert's, 982 P.2d at 887.

To the extent that Lee's IPBA claim against HPU is premised on HPU not offering Lee continuing work as an adjunct professor, there is no third-party to be interfered with.  The only relationship at play is between employer and employee.  Lee cites no authority for permitting IPBA claims against one's employer.  Accordingly, as matter of law, Lee has failed to state a valid claim for IPBA with respect to her work as an adjunct professor

To the extent that Lee's IPBA claim is based on the denial of her unemployment benefits, Lee contends that her relationship with the Department of Labor and Industrial Relations ("DLIR"), from which she sought unemployment benefits, constitutes a "valid business relationship."  (Lee Reply at 16.)  Lee, however, presents no case precedent or cognizable argument to support her contention that the relationship between an applicant and a government agency from which the applicant seeks benefits can be characterized as a "business relationship" for purposes of IPBA.  Certainly Lee has no contractual relationship with DLIR.  Neither does she have a "prospective advantage or expectancy" that is

reasonably probable to mature into "future economic benefit" given that Hawaii Revised Statutes ("HRS") § 383-30(2) expressly disqualifies employees discharged for misconduct from receiving unemployment benefits.  See also Medeiros v. Hawaii Department of Labor and Industrial Relations, 118 P.3d 1201, 1213 (Haw. 2005) ("where a claimant . . . is found to have been discharged for misconduct . . . neither the beneficent intent of the unemployment benefits statute nor the rule of liberal construction, trumps the clear and unambiguous language of HRS 383-30(2) that the individual is disqualified from receiving unemployment benefits."). Accordingly, the Court finds that, as a matter of law, Lee cannot satisfy the first element required to prove IPBA in regard to either her continued employment as a adjunct professor or the receipt of unemployment benefits.

III.        Intentional Infliction of Emotional Distress

Lee asserts that employees of HPU committed the tort of Intentional Infliction of Emotional Distress ("IIED") when they led her to believe she would still be employed as an adjunct professor but never actually provided her with additional work.  (Lee Opp. at 10.)  Lee claims she was led on by the combination of Kearns's termination letter, noting that her position as an adjunct professor was not affected, and the HR Department's submission to DLIR that she was still employed by HPU as an adjunct.  (Lee Opp. at 10.)  Lee asserts that this conduct

caused her severe emotional distress because she was unable to continue earning a

living teaching and was unable to collect unemployment benefits.  (Id. at 11)

The elements of IIED are: "1) that the act allegedly causing the harm

was intentional or reckless, 2) that the act was outrageous, and 3) that the act

caused 4) extreme emotional distress to another."  Hac v. Univ. of Hawaii, 73 P.3d

46, 60-61 (Haw. 2003).

> To demonstrate the first element, a plaintiff must show
> that the defendant acted either with a 'desire to inflict
> severe emotional distress, ... where he knows that such
> distress is certain, or substantially certain, to result from
> his conduct or recklessly ... in deliberate disregard of a
> high degree of probability that the emotional distress will
> follow.

Ritchie v. Wahiawa Gen. Hosp., 597 F. Supp. 2d 1100, 1110 (D. Haw. 2009)

(internal quotes omitted).   Recklessness, in turn, "involves more than

'inadvertence, incompetence, unskillfulness, or a failure to take precautions' but

instead rises to the level of a conscious choice of a course of action . . . with

knowledge of the serious dangers to other involved in it.'"  Id.  To satisfy the

second element, the act in question must have been "so outrageous in character,

and so extreme in degree, as to go beyond all possible bounds of decency, and to

be regarded as atrocious, and utterly intolerable in a civilized community."  Id.; see

also Ross v. Stouffer Hotel Co., 879 P.2d 1037, 1048 (Haw. 1994) (holding that

the discharge of an employee for a violation of company policy did not constitute behavior "beyond all bounds of decency").

Lee has failed to satisfy either of these elements. Lee has presented no evidence that either Kearns or the HR Department acted with either conscious desire to inflict harm or acted with deliberate disregard of probable severe emotional harm to Lee. Neither has Lee presented any evidence or substantial argument that Kearns's letter or the HR Department's response to DLIR constitutes outrageous conduct "beyond all bounds of decency."

In his deposition, Kearns stated that he reviewed and approved the letter terminating Lee from her Directors position and indicated that her position as an adjunct would be addressed separately. (Kearns 4/3/13 Depo at 15-16.) Although the timing is unclear from the record, Lee's supervisor Gallogly later informed her that due to her termination as Director she would not be offered further work as an adjunct professor.

Even if the HR Department was incorrect in reporting to DLIR that Lee was still employed as an adjunct professor, this error falls short of constituting an intentional or reckless "conscious choice" with knowledge of its consequences for injury. Moreover, it is certainly not "outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as

atrocious, and utterly intolerable in a civilized community."  Accordingly, the

Court holds that the undisputed facts of the case warrant summary judgment for the

Defendants on the issue of  IIED.

IV.            Negligent Infliction of Emotional Distress

              "Recovery for negligent infliction of emotional distress by one not

physically injured is generally permitted only when there is some physical injury to

property or [another] person resulting from the defendant's conduct."  Soone v.

Kyo-Ya Co., Ltd., 353 F. Supp. 2d 1107, 1118 (D. Haw. 2005).  Lee does not

allege a physical injury to herself, her property, or another person.

              The Hawaii Supreme Court has, however, carved out some exceptions

to this rule, such as where emotional distress was "particularly foreseeable."  See

e.g., John & Jane Roes v. FHP, Inc., 985 P.2d 661, 665 (Haw. 1999) (holding that

exposure to HIV blood and the associated fear of physical harm could support an

NEID claim without an actual showing of injury).  Id.  Generally, exceptions to the

physical harm requirement arise from the application of the "reasonable man"

standard; situations "where a reasonable man, normally constituted, would be

unable to adequately cope with the mental stress engendered by the circumstances

of the case."  Id. (citing Rodrigues v. State, 472 P.2d 509, 520 (Haw. 1970).

Soone, held, however, that the loss of employment, though no doubt stressful,

would not fall into this exception.  <u>Soone</u> 353 F. Supp. 2d at 1118.  The Court

reaches a similar conclusion here, and holds that Lee's loss of employment without

more, is insufficient to satisfy the "reasonable man" standard.

<u>CONCLUSION</u>

For the foregoing reasons, the Court GRANTS Defendants' Motion

for Summary Judgement and DENIES Plaintiff's Motion for Summary Judgment.

The Clerk of Court is DIRECTED to enter Judgment in favor of Defendants and to

close this case.

DATED:  Honolulu, Hawaii, February 26, 2014.

IT IS SO ORDERED.



  /S/ Barry M. Kurren
Barry M. Kurren
United States Magistrate Judge

<u>Marol K. Lee aka Marol K. Loftis v. Hawaii Pacific University, et al,</u>, Civ. No. 12-00604 BMK;
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND
DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT.